PEOPLE v WALKER

Docket No. 77-1350. Submitted June 9, 1978, at Lansing.—Decided
     October 2, 1978.
     Henry L. Walker was convicted of breaking and entering an
     occupied dwelling, Jackson Circuit Court, Russell E. Noble, J.
     Defendant appeals, claiming that the prosecutor's continued
     questioning of the defendant, who took the stand in his own
     behalf, about drug use by the defendant deprived him of a fair
     trial. *Held:*
         This line of questioning did deny the defendant his right to a
     fair trial where it was continued despite the defendant's insist-
     ence that he did not use drugs and where there was no other
     evidence introduced to show that the defendant used drugs.
         Reversed and remanded.                                    .

1. CRIMINAL LAW—EVIDENCE—HEROIN ADDICTION—PREJUDICE TO DE-
     FENDANT.
     The prosecution has a right to attempt to elicit evidence of heroin
     addiction from a defendant charged with other than a narcotics
     offense should he elect to testify; however, evidence of heroin
     addiction has a strong tendency to inflame a jury and the
     prosecution must proceed in this area with discretion and make
     every reasonable effort to avoid undue prejudice to the defend-
     ant.

2. CRIMINAL LAW—EVIDENCE—DEFENDANT'S DRUG USAGE—DENIAL OF
     FAIR TRIAL—PROSECUTOR'S LINE OF QUESTIONING.
     A defendant was denied his right to a fair trial and his conviction
     for breaking and entering an occupied dwelling should be
     reversed where the prosecutor attempted, but failed, to elicit
     from the defendant evidence of heroin addiction, and, by the
     way he framed his questions and through pointless repetition of
     questions about drug usage, underscored his personal disbelief
     of the defendant's testimony and encouraged the jury to draw
     an inference contrary to the unrebutted evidence.

REFERENCE FOR POINTS IN HEADNOTES
[1, 2] 29 Am Jur 2d, Evidence §§ 252, 253, 260.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Edward Grant,* Prosecuting Attorney, and *John L. Wildeboer,* Assistant Prosecuting Attorney, for the people.

*Kim R. Fawcett,* Assistant State Appellate Defender, for defendant on appeal.

Before: ALLEN, P.J., and CYNAR and D. R. FREEMAN,* JJ.

D. R. FREEMAN, J. Defendant Henry Lewis Walker was convicted by a jury of breaking and entering an occupied dwelling, MCL 750.110; MSA 28.305. He was sentenced to 3 to 15 years imprisonment and appeals as of right.

In the early morning of November 22, 1975, Barbara Walker (no relation to defendant) was awakened by her barking dog. She looked out the window of her house on North Dwight Street in Jackson, Michigan, and observed three men approach the back door of the house next to hers, that of Pamela Matthes, and look in the window. She called the police. She then saw the three men go around to the front of the house. At that point they were no longer in view. She heard glass breaking. Pamela Matthes was not home at the time.

Officers Michael Brunk and Moses Lewis of the Jackson Police Department arrived at the scene at the same time. Officer Brunk heard a door open and close quickly in the front of the house. Officer Lewis positioned himself in front of the house at the southwest corner. Officer Brunk went around back, to the northwest corner of the house where he saw a rear door open. He ordered whoever was

---

* Circuit judge, sitting on the Court of Appeals by assignment.

in the house to come out. No one came out; the door closed.

Meanwhile, a third policeman, Officer Roger Ramirez, arrived. Officer Ramirez checked the garage and the southeast basement window. He noted that the window was secure. He stationed himself near the northeast corner of the house. He observed a second door in the rear of the house open and the silhouette of a person inside. Then Officer Brunk again ordered whoever was inside the house to come out. No one came out.

Officer Ramirez then heard noises coming from the southeast side of the house. He saw defendant walking down the driveway toward the street and arrested him. He noted that the southeast basement window, which had been secure when he arrived, was now broken at the hinges. There was access from the first floor of the house to the basement.

After defendant was arrested, Officer Brunk entered the house. He found that a window pane in the front door was broken and that fragments of glass had fallen into the house. It was possible to reach through the broken pane and unlock the door from the inside. The house was in disarray. Pamela Matthes testified that she did not leave the house in such a state of disorder. Officer Brunk found a television, a vacuum cleaner and a stereo amplifier and speaker stacked near the front door. A search of the house failed to turn up additional suspects.

Defendant testified in his own behalf. He stated that on the night in question he had been on his way to a motel with a girlfriend; that he had been riding in her car; that they had had an argument; and that she had ordered him out of the car on Dwight Street. While walking down the street, he

had noticed the commotion around the Matthes house and walked halfway up the driveway. After he had turned around and started to leave, he was arrested.

On cross-examination, the prosecutor asked defendant whether anything was found on his person when he was searched after his arrest; defendant replied in the negative. Yet, the prosecutor persisted and, although defendant denied over and over again that anything but cigarettes and matches had been discovered, asked if a syringe had been found in defendant's pocket; defendant replied in the negative. Still, the prosecutor doggedly pursued this line of questioning. Eventually, he asked defendant if he had been taking any drugs during November of 1975; defendant replied in the negative. Here again, the prosecutor persisted and eventually asked defendant if he had told a police detective who questioned him that he had been using heroin during this period; defendant replied in the negative. Defense counsel finally objected on the ground of relevancy and asked that the testimony be stricken.[1] The prosecutor argued that drug usage went to the issue of motive. The trial court overruled the objection. The prosecutor continued, finally asking defendant if he hadn't stated to the police detective that he had used a drug four days before the offense; defendant replied in the negative. Defendant asserts that this line of questioning denied him a fair trial. We agree.

In affirming a defendant's conviction for armed robbery, this Court held in *People v Talaga,* 37 Mich App 100, 103; 194 NW2d 462 (1971):

---

[1] This testimony, including defense counsel's objection, is set forth in full in the appendix to this opinion. While the objection might have been framed with greater precision, on this record we deem it sufficient to preserve the question for appellate review.

"Whether the defendant was a *heroin addict* at or near the time of the offense was relevant and material to the establishment of a motive for defendant's commission of the crime charged. Motive, if established, would tend to rebut defendant's contention that he was at home and knew nothing of the charge made against him." (Emphasis added.)

We accept this statement as a general proposition of law applicable in cases involving larceny[2] and recognize that other acts of the defendant which tend to show his motive may be proved notwithstanding that such proof may show or tend to show the commission of another crime by the defendant. MCL 768.27; MSA 28.1050; *People v Wilkins,* 82 Mich App 260; 266 NW2d 781 (1978). *Cf. People v Mullins,* 79 Mich App 515; 261 NW2d 67 (1977). However, this does not dispose of the case before us.

The people did not introduce one shred of evidence in their case in chief that defendant was a heroin addict at the time of the offense. Although Officer Lewis, who searched defendant at the police station, testified, he was not asked whether he found a syringe.[3] Further, the police detective to whom defendant allegedly made the statement

---

[2] The legal relevance of such evidence to motive for a theft offense would seem to depend upon proof of three factors: (1) that defendant not merely used a drug, but that he used a drug which is addictive and that he actually was, in some substantial measure, addicted, and thus, compelled to obtain the drug; (2) that he used the drug in such quantity that maintenance of his habit was expensive; (3) that he lacked sufficient income from legal sources to sustain his habit. *See United States v Mullings,* 364 F2d 173, 175–176 (CA 2, 1966). The fact that a witness is a heroin addict, alone, may be relevant to the question of his credibility, *Talaga, supra,* but, as discussed below, the people produced no evidence that defendant was a heroin addict.

[3] Here, we would note that a syringe has lawful uses. The fact that a defendant charged with breaking and entering was in possession of a syringe when arrested, alone, without other evidence of heroin addiction has no legal relevance. *See People v Lorenzo Williams,* 63 Mich App 389, 391–392; 234 NW2d 537 (1975).

that he had used a drug four days before the offense was not endorsed and called to testify.

We acknowledge the people's right to attempt to elicit evidence of heroin addiction from a defendant should he elect to testify and we in no way impugn this prosecutor's good faith in *broaching* the subject on cross-examination here. *Cf. People v Ball,* 33 Mich App 288; 189 NW2d 816 (1971). However, evidence of heroin addiction has a strong tendency to inflame the jury. The people must, therefore, proceed in this area with discretion and make every reasonable effort to avoid undue prejudice to a defendant. Here, the prosecutor's attempt to elicit evidence of heroin addiction from defendant failed utterly. Defendant categorically denied that the police had found a syringe when they searched his person, and denied that he had, or had stated to the police that he had, used a drug during the period preceding the offense. Although the record is, therefore, devoid of such evidence, the prosecutor, by the way he framed his questions and through pointless repetition of the questions, underscored his personal disbelief of defendant's testimony and encouraged the jury to draw an inference contrary to the unrebutted evidence. We can not condone such a practice. The tactic is all the more intolerable because motive, strictly speaking, is not an element of the crime that the people must prove; and "[t]he motive for a theft offense seldom requires explanation". *People v Henderson,* 80 Mich App 447, 454; 264 NW2d 22 (1978). We hold that defendant was denied a fair trial and reverse his conviction.

Our disposition of the case renders unnecessary a discussion of defendant's other two allegations of error.

Reversed and remanded.

APPENDIX

"Q *[by Mr. Wildeboer, Assistant Prosecuting Attorney]* And were you searched at the station?

"A I was searched before I was put in the car, and then I was searched at the station again.

"Q You were searched at the station a second time?

"A (Nods head)

"Q Before you were locked up?

"A Yes.

"Q Okay. Was this job you had in interior decorating, were you supporting yourself on that job?

"A Well, I was doing okay.

"Q Well, what do you mean by 'doing okay'?

"A Well—

"Q Is that enough money for your needs?

"A Yes.

"Q Was anything found on your person when you were searched at the station the second time?

"A No.

"Q Nothing was found on your person?

"A No.

"Q What about on the first time you were searched?

"A No.

"Q Was nothing ever found on your person?

"A No.

"Q Were you—What were you wearing at this time?

"A Bluejean jacket, some green pants, a green cap, brown shoes, and, I think, I had on a beige sweater.

"Q Now, okay, this was a bluejean jacket, some kind of coat you had on?

"A Bluejean jacket.

"Q I see, and when you were searched at the station, was anything found in this bluejean jacket?

"A Not to my knowledge.

"Q Not to your knowledge. You were never shown anything?

"A No.

"Q What kind of search were you given at the station?

"A Strip search.

"Q Were you carrying anything in this bluejean jacket?

"A Nope.

"Q There is nothing in this jacket?

"A Nothing but cigarettes.

"Q Nothing but cigarettes?

"A Cigarettes and matches.

"Q If something had been found in the pocket of this coat outside of cigarettes and matches, you wouldn't know about it?

"A No.

"Q It wasn't there?

"A (Shakes head).

"Q Was anything resembling a syringe found in your coat?

"A Not to my knowledge.

"Q Were you carrying any such thing?

"A No.

"Q Wasn't in your pocket?

"A No.

"Q Was it Officer Lewis who searched you at the station?

"A Yes, it was.

"Q I see, and he checked your bluejean jacket?

"A Yes, he searched me completely.

"Q And there was no such thing as a syringe in your jacket?

"A Nope, not that I know of there was, there wasn't.

"Q Not that you know of. Well, it was your jacket?

"A Yes, it was.

"Q You didn't borrow it?

"A What I am saying, like I didn't have a syringe in it.

"Q Well, the jacket you had on was your jacket?

"A Right.

"Q You hadn't loaned it to anybody recently, had you?

"A No.

"Q This was yours and you hadn't borrowed it, either?

"A No.

"Q Were you taking any drugs during this period in November of '75?

"A No.

"Q You weren't spending any money for drugs during this period?

"A No, nope.

"Q And you weren't using any kind of drugs during this period of November of '75?

"A Nope.

"Q Did you ever tell anybody after your arrest that you were?

"Q (Shakes head)

"A Did you discuss this with Detective Conant of the City police?

"A He questioned me about the incident before I came to court.

"Q I see. This would have been around . . .

sometime after the incident, before you were arraigned?

"A Before I was arraigned, yeah.

"Q This is sometime in the morning, say around ten-thirty of the twenty-second?

"A The next morning, yeah.

"Q And this was a detective from the City Police that interviewed you?

"A Yes.

"Q And did you . . . did you say anything to him about using any kind of drugs during this period.

"A That I was using drugs?

"Q Yes.

"A No, I didn't.

"Q You told him you weren't using drugs?

"A Yes.

"Q Did you make a statement to Detective Conant in this interview that sometimes you were using heroin during this period?

"A No.

"Q You didn't?

"A I told him that I had used heroin before, but at the time I was not using.

"Q Did you make a statement to Detective Conant about the last time you had used heroin?

"A Yes, I did.

"Q When did you tell Mr. Conant the last time you had used heroin before you got arrested?

"MR. OLK [defense counsel]: Your Honor, I am going to object to this instance, I don't like to object in these situations, but I see that this has absolutely nothing to do with this case. He has testified repeatedly that he had no affiliation with drugs.

"Detective Conant is not endorsed on the infor-

mation as a witness; he's not here. I don't know what we're talking about, and I think it should be stricken.

"THE COURT: Mr. Wildeboer?

"MR. WILDEBOER: Your Honor, it would be my contention it would to to the motives, since this is a special intent offense, of intent to commit a larceny and that whatever drug usage here would go to the motive of the defendant to commit this offense, and I believe the Defendant, Mr. Walker, did answer, as far as Mr. Olk saying there was no connection between him and any drug usage, I believe Mr. Walker did answer in the affirmative to one of my questions concerning this.

"MR. OLK: But not at this time, your Honor.

"THE COURT: Well, I will permit you to go ahead. Overruled.

"Q (by Mr. Wildeboer) Now, Mr. Walker, did you make any statement to Detective Conant about the last time you had used a drug prior to your being arrested.

"A Yes, I think I did.

"Q And when did you tell him was the last time you had used any kind of drug?

"A About five or six months, I think.

"Q Five or six months?

"A I think that is what it was.

"Q You didn't make any statement about the last time using a drug was about four days before this date?

"A No.

"Q You did not make any such statement?

"A No.

"MR. WILBEBOER: I'd have no further questions of this witness."