# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL PATRICK-MURPHY HAMILTON,

        Defendant-Appellant.

UNPUBLISHED
February 9, 2016

No. 319980
Jackson Circuit Court
LC No. 12-004848-FC

Before: SAWYER, P.J., and M. J. KELLY and SHAPIRO, JJ.

SHAPIRO, J. (*dissenting*)

I respectfully dissent.

On September 8, 2012, defendant fatally shot Robert Marcyan for no apparent reason. The defense at trial was insanity resulting from a psychotic reaction to the stimulant Adderall, which had been prescribed to defendant by his psychiatrist.

The jurors' task required them to consider the opinions of forensic experts in medicine and human psychology. Reliance upon experts on questions involving forensic science is by no means uncommon. Jurors rely upon the testimony of forensic experts in a wide variety cases. For example, in a case that turns on DNA or fingerprint evidence, the jury cannot determine on its own whether there is a "match;" it must instead rely on expert opinions and if there are conflicting opinions choose the one it finds credible and consistent with the evidence.

However, we do not expect or permit jurors to do this alone. The trial court must act as a gatekeeper. For example, in a case involving DNA evidence it would be error for a trial court to allow a non-expert to give testimony as to a DNA match. It would also be an error if the court allowed a properly-qualified expert to testify to a DNA match on the basis of general information about DNA or on the expert's intuition instead of case-specific verifiable testing.

In my view, the trial court made such an error in this case. Over repeated objections, the court admitted speculative and highly prejudicial expert testimony concerning the central issue in the case. The prosecution's witness testified without proper expertise, with an inadequate evidentiary foundation, and with no apparent methodology other than to state her gut feelings. She offered testimony about the medical and psychological condition of defendant even though she lacked a license in either of those fields and had not met him or reviewed his medical records. Essentially she testified as a soothsayer. She offered her opinion as to what drugs

-1-

defendant was taking, when he was taking them, how much he was taking, and how badly he needed more. She cited no evidence for these conclusions. She even went so far as to characterize defendant as likely to be deceitful and violent.

This testimony violated MRE 702, MRE 703, MRE 404(a), and MRE 405. And because the testimony went to the critical issue in the case, it cannot be deemed harmless. Accordingly, we are obligated to reverse defendant's conviction and remand so that the question of defendant's criminal responsibility can be properly determined in a new trial.

## I. FACTUAL BACKGROUND

On September 8, 2012, defendant Hamilton fatally shot Robert Marcyan. He asserts that at the time of the shooting he suffered from a paranoid mania induced by the stimulant Adderall,[1] which was prescribed to him in increasing dosages by a licensed psychiatrist. His defense was supported at trial by the testimony of an examining forensic psychologist and by lay testimony that his behavior in the weeks preceding the shooting was increasingly paranoid and delusional.

At the time of the shooting, defendant was 33 years old, had two children, and was living with his girlfriend Shannon Arquette. The record before us indicates that he had no criminal record and no history of violent or larcenous behavior. He had been employed on an assembly line for Ford Motor Company for 15 years, apparently without incident until he was suspended from work shortly before the shooting due to his increasingly aberrant behavior.

On the day of the shooting, defendant was at his family's cottage in Jackson County. His father, Mark Hamilton, who owned the cottage, had previously spoken with Robert and Richard Marcyan about repairing the outdoor stairs at the cottage leading from the porch to the lakeshore. The Marcyans and the Hamiltons had been loosely acquainted for many years and Robert Marcyan had done repairs at Mark Hamilton's home previously. Mark Hamilton made arrangements to meet the Marcyans at the cottage on September 8, 2013. Early on September 8th, however, he called the Marcyans and told them that he was ill and could not make it. One of the Marcyans asked if they could go out and look at the project without him and he agreed.

Defendant did not know that the Marcyan brothers would be coming to the cottage. When they knocked at the door, he came out onto the porch and, according to Richard Marcyan's testimony, the three men had a pleasant conversation. Defendant showed them the stairs needing repair, and all three returned to the porch with no sign of acrimony or problem. Defendant went back inside the cottage and a few minutes later came back outside with a gun concealed beneath

---

[1] Adderall is the brand name of Dexedrine, a stimulant categorized as a Level II controlled substance. According to the FDA approved medication guide, "Treatment emergent psychotic or manic symptoms, e.g., hallucinations, delusional thinking, or mania in children and adolescents without prior history of psychotic illness or mania can be caused by stimulants at usual doses. If such symptoms occur, consideration should be given to a possible causal role of the stimulant, and discontinuation of treatment may be appropriate." http://www.accessdata.fda.gov/drugsatfda_docs/label/2007/011522s040lbl.pdf.

a shirt on his hand. He fired the gun at Robert Marcyan, fatally injuring him. Richard Marcyan, who had been on his cell phone with defendant's father, immediately ran to his brother's side and attempted to call 911. As he was dialing he heard defendant fire several more shots but neither he nor his brother were struck. Richard then ran towards his car where he found defendant standing near it and smiling at him. Defendant continued to smile as he pointed the gun at Richard and pulled the trigger several times. Fortunately, there were no bullets left in the gun. A neighbor who had heard the shots called out to defendant and asked if everything was alright. Defendant gave him a "thumbs up" sign, turned, and walked back to the cottage.

As defendant walked back to the cottage, Richard—frightened and deeply concerned about his brother—went to the neighbor's house to seek help. He and the neighbor saw defendant come back out of the cottage, get in Marcyan's car, a 1995 BMW, and drive off. In his testimony, Richard agreed that nothing defendant did provided any warning and that the events had gone "from a normal situation to something bizarre and kind of crazy."

At trial and at the subsequent *Ginther*[2] hearing, Richard testified his brother had been wearing a substantial amount of gold jewelry on the day of the shooting, but that defendant did not attempt to take any of it. The jewelry included a $20,000 gold and diamond ring, a Rolex watch worth approximately $10,000, and other gold jewelry including necklaces and bracelets. Defendant was found with approximately $360 in his possession after his arrest, which he had not had the day before. Richard testified that defendant did not go through his brother's pockets and the prosecution argued that defendant found this money in Marcyan's vehicle. The defense did not present any evidence to the contrary and did not appear to dispute it.

Defendant led the police on a chase through the woods. At one point, the car was badly damaged after going off an 8 foot drop, but the chase continued. Defendant drove or crashed Marcyan's vehicle into a nearby lake. He then went to the nearest cottage where he got in a pick-up truck parked in the driveway. Defendant drove off and the chase continued at speeds up to 100 mph. Finally, the police laid a set of tire-piercing strips on the road ahead of defendant and after all four tires were punctured, the truck slowed and stopped.

When the police approached, defendant did not resist. He was placed in a police cruiser. He did not smell of alcohol and was not tested for alcohol or drugs. Although he did not speak, he sang church songs on and off during the ride to the police station. He was booked into the jail where he was reported to have symptoms of unstable mood, agitation, and difficulty sleeping. On his third day in jail, defendant attempted suicide.

When the police searched the Hamilton cottage they found an array of weapons and would-be weapons. Three knives and other kitchen utensils were hidden under couch cushions, a fourth knife was found in the yard, and a fifth knife was on the ground near the waterfront. A frying pan and a pot were also found under couch cushions. Tools were laying out on a blanket in the house including a hammer, bolt cutters, and a hand saw. Half of a broken pool cue was stuck into the ground outside.

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

## II.  THEORIES OF THE CASE

### A.  PROSECUTOR'S THEORIES

The only issue at trial was whether or not defendant was legally insane at the time he shot Marcyan.  The lack of any apparent motive for defendant to have shot Marcyan presented a challenge for the prosecution.  Indeed, in opening statement, one prosecutor addressed this issue squarely, telling the jury: "This case does not make sense in the usual sense . . .  It doesn't involve money, drugs, women, jealousy, absolutely nothing."  He went on to stress to the jury that motive is not an element of the offense.  While the defense did not dispute this truism, it pointed out that the complete absence of motive for such a crime strongly supported the insanity defense.

In the opening statement, the prosecutor also explained to the jury the distinction between voluntary and involuntary intoxication.  He explained that even if the jury believed that defendant was rendered mentally impaired or delusional by the Adderall this was legally insufficient to prove mental illness if it had been the result of a voluntary decision to take more Adderall than was prescribed.  A review of the entire trial record reveals that the jury was never presented with direct evidence that defendant took more than his prescribed dosage of Adderall, but there was significant circumstantial evidence consistent with that conclusion.  His doctor testified that defendant obtained extra prescriptions on three occasions.  Once defendant reported that he had lost his medication, a second time that he had left it in his pants pocket in the washing machine, and a third time that it had been stolen.  In addition, defendant's last bottle of pills was found empty at the cottage even though the prescription had been dispensed only 10 days earlier with a month's supply of medication.[3]  Nevertheless, the psychiatrist who prescribed the medication, the defense forensic psychologist and the prosecution forensic psychologist each of whom reviewed the medical records and examined defendant opined that defendant was taking the drug as prescribed and not abusing it.

According to the prosecutor's testimony at the *Ginther* hearing, after opening statements had been given and proofs were underway, the second prosecutor developed an alternative theory of the case.  She concluded that defendant was an active opiate addict, needed to obtain an opiate "fix" at the time of the shooting, and that he shot Marcyan in order to rob him so that he could purchase that "fix."[4]  This theory addressed the two areas of weakness in the prosecution's case.

---

[3] Defendant's girlfriend testified that when he was away from home defendant would only carry with him the necessary number of pills, but she conceded that she had not located the balance of that last prescription at their home.

[4] There was evidence that defendant had abused Vicodin in 2009 and 2011.  His medical records demonstrated in 2009 he had become dependent on Vicodin after initially being prescribed it following surgery.  He was treated for this dependency with Suboxone for several weeks with apparent success.  Defendant told the examining psychiatrists that he relapsed into a Vicodin addiction in 2011 and had purchased it illegally at that time.  His medical records showed that he again sought treatment and was again placed on Suboxone for several months.  There was, however, no evidence that defendant was using Vicodin in the days, weeks or months preceding

First, it answered the question of motive. It defined a rational motive for defendant to have shot Marcyan. Second, even if the jury believed the prescribed Adderall had affected defendant's mental state, it showed that a second drug, one which was not prescribed, was involved thereby negating any claim of involuntary intoxication.

In closing argument, the prosecution presented its new theory, telling the jury that defendant was "nothing but a run of the mill drug addict, out of money, out of drugs, looking for his next fix" when "along comes opportunity. Opportunity knocking at his door, driving a BMW, wearing over $30,000 worth of jewelry . . . A Rolex gold ring with a diamond in it so big its flashing in the sun . . . [Defendant] must have thought he'd hit the jackpot."

## B. DEFENDANT'S THEORY

Defendant presented expert and lay testimony in support of his insanity defense. In a nutshell, the defense argued that as a result of Adderall, taken pursuant to prescription, defendant developed delusional mania and paranoia that ultimately culminated in the tragic shooting of Marcyan.

## 1. TREATMENT BY DR. RAAD JAJO

According to the record, defendant, who had had a childhood history of attention deficit disorder (ADD), told his girlfriend that he was having difficulty concentrating. His girlfriend made an appointment for him with a psychiatrist, Dr. Raad Jajo, who saw defendant for the first time on November 9, 2011. At that first visit, Dr. Jajo diagnosed defendant with adult ADD and prescribed him Adderall, a strong stimulant sometimes used to treat ADD. Dr. Jajo initially prescribed 20 mg of Adderall daily.

Defendant continued to see Dr. Jajo for the next 10 months and was under his care through the day of the shooting. Dr. Jajo testified that all the appointments except the first one lasted 20 minutes. He also testified that he saw 30-40 patients per day. He testified that he never took defendant's weight or checked his blood pressure despite the increasing doses of stimulant he prescribed defendant.[5] Defense witnesses testified that defendant lost a significant amount of weight while under Dr. Jajo's care.

On December 3, 2011, less than a month after their first meeting, Dr. Jajo doubled defendant's dosage from 20 mg per day to 40 mg per day. On January 7, 2013, defendant reported that he was doing a lot better and that he had written a song for Dr. Jajo while in the waiting room. On February 4, 2012, defendant told Dr. Jajo that he was going to write a book about his condition and the help that Dr. Jajo had given him. At that visit Dr. Jajo increased the prescribed dosage to 50 mg per day. Dr. Jajo testified that defendant sent him a note saying that

_____

the shooting, and it was not disputed that when arrested and jailed, defendant displayed no symptoms of opiate withdrawal.

[5] Dr. Jajo agreed that the potential side effects of Adderall included weight loss and blood pressure changes as well as psychosis and delirium.

because he was so grateful to Dr. Jajo for helping him, he planned to include him in his "next lyric and CD."

On March 17, 2012, Dr. Jajo again saw defendant and recorded in his notes that defendant told him: "I've been in complete darkness and then found a light and then no more darkness; it is great" and "I didn't know how smart I was till you got me on the right medication."

Dr. Jajo next saw defendant on April 14, 2012. At that appointment, defendant reported that he was producing four record albums that year and that one was "going to reach platinum [one million copies sold] soon." Dr. Jajo testified that he viewed these reports as a sign that defendant's "accomplishment was improving" and his "productivity [was] increas[ing]" as a result of the Adderall. Two weeks later, on April 26, 2102, defendant reported to Dr. Jajo that his dosage was no longer effective. Dr. Jajo opined that defendant was developing a tolerance and increased the dosage to 60 mg per day.

On July 5, 2012, defendant told Dr. Jajo that he was feeling scattered and that he had lost his medication for the second time. Dr. Jajo wrote him a new 2 week prescription. On July 18, 2012 defendant returned and, according to Dr. Jajo's testimony, he stated that he was feeling overwhelmed and stressed out, that he and his girlfriend had broken up, and that she had violently attacked him.

Eight days later, on July 26, 2012, defendant was back at Dr. Jajo's office stating that he was stressed out, nervous, and unable to sleep. Dr. Jajo noted that defendant was anxious, tense, fidgety, and was cracking his knuckles. Dr. Jajo did not consider these signs to be side effects of the Adderall.

On August 2, 2012, according to Dr. Jajo, defendant spent much of their appointment talking about his belief that his father had made false accusations against him. Dr. Jajo testified that he viewed these reports as indicative of emotional hurt and not paranoia. On August 16, 2012, Dr. Jajo noted that defendant was suffering from "anxiety, conflict with father, tension headache, somatic symptom[s]" none of which had been noted at the outset of Dr. Jajo's treatment. On August 29, 2012, Dr. Jajo concluded that defendant needed time off work and wrote him a sick leave slip through September 8th. At that visit he also reduced defendant's Adderall prescription from 60 mg to 40 mg.

When asked in his testimony to describe symptoms of paranoia, Dr. Jajo referenced suspiciousness, thinking that people are watching you, isolation, and guarding. He agreed in his testimony that the hiding of weapons around one's house would indicate that paranoia had reached a delusional level.

Dr. Jeffery Wendt, a forensic psychologist who testified for the defense, stated that defendant's response to the Adderall as recorded in the Dr. Jajo's notes made it clear that very quickly after beginning the medication, defendant developed symptoms of paranoia as well as delusional grandiosity. He was highly critical of Dr. Jajo's decision to increase the Adderall dosage rather than discontinuing it altogether.

## 2. OTHER STATE-OF-MIND EVIDENCE

Shannon Arquette was defendant's girlfriend from December 2010 to sometime after the shooting. She testified that she had known defendant since they were teens and that they had become romantically involved after his divorce. She described him as warm-hearted and gentle. Shortly before they moved in together, defendant went to see Dr. Jajo for the first time. She testified that initially the Adderall seemed to have a positive effect on defendant. However, she stated that by April 2012 he began to act paranoid. She testified that when the weather got warm and she started opening windows, defendant would close them and tell her that "they" could come in through the window. She said he started hearing voices that she did not. She testified that as time went on, defendant could no long sit still and watch TV or a movie. He paced much of the time and repeatedly checked that the doors and windows of the house were locked. He began to talk about making CD's with Dr. Dre and Eminem and about making a movie.

According to Arquette, in spring of 2012, defendant was losing weight and was not sleeping well. She stated that at some point, defendant bought a gun from a neighbor. She told him that she did not want a gun in the house, but he said that it was necessary for protection from "them." He also started hiding other weapons around the house including a knife hidden under the mattress, a hammer in a drawer, and a screwdriver in a dresser drawer. He told her they were necessary for protection. Eventually, he would not let her sit outside the house for fear that she would be attacked. The last time Arquette saw defendant was three days before the shooting. She was cutting the grass and he pulled up in the car and told her: "get in the house . . . if they see you they're gonna get you because of me."

Another lay witness, Anthony Galea, testified as to his observations of defendant. Galea was the employee services representative for the UAW at the plant where defendant worked. He testified to drastic changes in defendant's behavior and personality in the months before the shooting. He testified that beginning in late 2011, around the time he began treatment with Dr. Jajo, defendant began to have a difficult time standing still for a conversation and that during 2012 defendant became "very hyper." Galea was concerned about defendant and so started meeting with him from time to time. By June 2012, he noticed that defendant was getting worse: he no longer smiled, was losing weight, and was beginning to miss shifts. He called defendant into his office to discuss things and when defendant came into his office he appeared paranoid, saying, "Sshh Tony, there's someone listening at the door." This behavior was often repeated. Defendant told him that people were following him and meddling in his business. He also told Galea that he was going to LA to meet with Dr. Dre and Eminem.

According to Galea, defendant's behavior became even more erratic, and eventually defendant did not want to come into the building where they worked. Galea testified that the supervisors at the plant resisted disciplining defendant, but eventually they had to do so and suspended him without pay. The union offered to file an appeal for defendant or to attempt to get his suspension reduced, but defendant refused assistance. Galea testified that the last time he saw defendant was in August 2012 and that defendant appeared hyper and tense and nothing like the person he had been before.

Dr. Wendt testified that in conducting his evaluation,[6] he spoke with several of defendant's family members about defendant's behavior in 2012. Family members described defendant bragging about being a successful musician and a millionaire and saying that others were jealous and trying to use him. His mother and one sister stated that defendant told them he was being watched, that he had gotten a gun, and that he would protect them. His other sister stated that defendant came to her sobbing in May 2012 and told her that the devil was coming for him and that he could hear their dead aunt speaking.

Dr. Wendt also testified about defendant's recollections of the day of the shooting. These involved being told by voices that he was in a movie playing an Irish gangster, believing there were cameras tracking him, and receiving other messages through images on a TV screen and a license plate. Defendant reported that he believed that the Marcyans' arrival at the cottage was part of the movie, that they were being filmed, and that the gun was a prop filled with blanks. Dr. Wendt opined that as a result of taking Adderall, defendant had developed a mania which by August 2, 2012 had begun to affect his cognition and which became a full blown psychosis by the day of the shooting.

## 3. TESTIMONY OF THE PROSECUTION'S EXAMINING FORENSIC PSYCHOLOGIST

Dr. Glen Toplyn, a forensic psychologist, testified for the prosecution in rebuttal. He conducted a forensic examination of defendant about two months after the shooting.[7] While he agreed that he could not offer a rational explanation for defendant's actions, he opined that defendant was not mentally ill at the time of the shooting. He relied heavily on the fact that Dr. Jajo's records contained no concerns about defendant's response to the Adderall, and he concluded that it was not reasonable to suggest that after months of doing well on that medicine it would suddenly cause mental illness on the day in question.

Dr. Toplyn also testified that if someone was delusional there should be confirmation of altered behavior by others and, that without that confirmation, defendant's description of his claimed delusions should not be considered reliable. He noted that the doctor who saw defendant at the jail did not note any indications of delusional behavior upon initial evaluation and that defendant did not say anything to the police officers suggesting to them that he was delusional. He also opined that defendant's later explanation of his delusions appeared contrived or invented. Finally, he noted that during the police chase, defendant had dropped the gun in the lake, an action he viewed as inconsistent with defendant's claimed belief that he was in a movie.

When cross-examined about his conclusion that there was no corroboration, he agreed that he had not interviewed any of defendant's family members or any other people who had

---

[6] Dr. Wendt testified that he interviewed defendant on three occasions for a total of 8 ½ hours, in addition to administering psychological testing, reviewing records and interviewing defendant's family and friends.

[7] His evaluation was based on a 1 ½ hour interview of defendant, psychological testing, and a review of records.

observed defendant in the period prior to the shooting. He also agreed that he had uncritically accepted Dr. Jajo's opinion that defendant had been doing well on the Adderall prior to the day of the shooting. Dr. Toplyn also conceded that he had not known that defendant had been hiding weapons and that such behavior was consistent with paranoia. Finally, he agreed with Dr. Wendt that there was no proof that defendant was misusing or abusing any drugs at the time of the shooting.

## 4. TESTIMONY OF ROSEMARY HEISE

Rosemary Heise testified as an expert witness in the prosecution's rebuttal case. Admission of her testimony violated multiple rules of evidence including MRE 702, MRE 703, MRE 404(a), and MRE 405. Although this murder case had been pending for over a year and defendant had filed his notice of insanity defense months earlier, Heise was not identified as a prosecution witness until the week before trial. The prosecutor's amended witness list neither identified Heise as an expert nor set forth the nature of her expected testimony.

After the defense rested, defense counsel stated that it was his understanding that the prosecution would be calling Heise as an expert in its rebuttal case. He objected to her testimony both on her qualifications and its substance. The prosecution confirmed its intent to call Heise in rebuttal "as an expert in the area of psychology, specifically with an expertise in substance abuse." The trial court took testimony from Heise with the jury excused. When asked by defense counsel what it was she was asked to give an opinion about, Heise responded "To discuss the history of Mr. Hamilton's substance abuse." She stated that she had not met or spoken with the defendant or any members of his family and that her initial contact about the case had been the prior week. During this offer of proof, Heise did not state what her opinion was nor how she arrived at it. She testified that she was not a physician, a licensed psychologist, or a licensed limited psychologist. She explained that she had a nursing degree, had obtained a masters degree from Western Michigan University in "counseling psychology with a minor in addiction studies," and had worked in various capacities at several addiction treatment centers. She testified that she was employed by the Jackson Circuit Court as the clinical manager of the "Recovery Court program," which is a treatment program for felons with serious addictions. She explained that her job with the trial Court was to evaluate convicted defendants whose sentencing guidelines put them in a "straddle cell" and to determine if those defendants would benefit from a drug treatment program rather than a jail sentence.

At the conclusion of Heise's testimony to the bench, defense counsel stated: "I'm still unclear as to what she is qualified as an expert in. I'm not being funny. I don't understand that yet. So what is it that we can expect her to be an expert in?" The court responded, "I'm not here to preview what she is going to testify, the details at this point." However, what remained unexplained was not the details of her testimony but any notion of what opinions she would be offering and what evidence and methodology they would be based on.

The prosecution, per the court's directive, provided the defense with a report from Heise on the next business day and she was called as a witness two days later. The attorneys again conducted voir dire of the witness, this time in the presence of the jury. Heise stated that she had never testified as an expert in a criminal case, but had testified in five or six child neglect cases

as to "possible substance abuse issues." After voir dire, defense counsel renewed his objection, stating:

> Your Honor, I believe it's problematic. The only experience she has appears to be . . . abuse and neglect, or with Recovery Court where person have an admitted and documented track record of narcotic abuse or are seeking dispensation and have something to gain by working with her. I believe that she is not licensed as a physician, she is not licensed as a psychologist, she's never been qualified . . . in a capital murder case before and I guess my quandary is twofold. One, just what is it she's going to give an opinion about, which is not clear, and . . . once we answer that question I can go further into my voir dire, but right now she's a Recovery Court coordinator who's going to give a psychosocial medical diagnosis about my client.

At that point, the trial court ruled that Ms. Heise met the requirements of MRE 702 and stated that "she will be allowed as an expert in the area of substance abuse and addiction."

MRE 702 provides that an expert may testify if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles reliably to the facts of the case." None of those matters were addressed by the court in its ruling. However, "[t]he trial court has an obligation under MRE 702 'to ensure that any expert testimony admitted at trial is reliable.' " *People v Dobek*, 274 Mich App. 58, 94, 732 NW2d 546, 570-71 (2007) (quoting *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004)). Further, "[w]hile the exercise of the gatekeeper function is within a court's discretion, the court may neither abandon this obligation nor perform the function inadequately. *Dobek*, 274 Mich App at 94. Expert testimony is to be excluded "when it is based on assumptions that do not comport with the established facts or when it is derived from unreliable and untrustworthy scientific data." *Id*., citing *Tobin v Providence Hosp,* 244 Mich App 626, 650–651; 624 NW2d 548 (2001) and *Badalamenti v William Beaumont Hosp-Troy,* 237 Mich App 278, 286; 602 NW2d 854 (1999).

In *Gilbert*, the Supreme Court stated that "junk science" must be excluded, and it emphasized:

> MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology. [*Gilbert*, 470 Mich at 782.]

It cannot be reasonably argued that the trial court conducted the "searching inquiry" mandated by *Gilbert*. And with no apparent limitations on the scope of her testimony, Heise

proceeded to present an astoundingly broad and speculative set of opinions.[8] She testified that she would diagnose defendant as an "addict" because he had a documented episode of Vicodin abuse. She stated that addicts are either active or "in recovery." Therefore, even if defendant had stopped taking Vicodin months before the shooting, he could not be considered to be "in recovery" because he was taking a different drug, Adderall. Therefore he remained an active addict. She cited no principles or standards to support this analysis.

Having given her opinion that defendant remained an active addict, she then speculated that at the time of the shooting defendant was probably still using Vicodin despite the absence of any evidence that he was and the fact that he did not undergo any opiate withdrawal symptoms after his arrest. She cited no evidence that defendant had obtained or used Vicodin in the months prior to the shooting but stated that his prior history would "raise a red flag for me if I was working with a client and wondering about his actual current use of Vicodin."[9] This is precisely the type of speculation that is intended to be avoided by the requirement in MRE 703 that the "facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence."

The prosecution has not cited a single case and none has been revealed by our research, where a "substance abuse counselor" has been permitted to opine as an expert that a particular person was using drugs at a specific time, let alone the type of drug or how much. It appears that Heise's testimony is unprecedented.[10]

---

[8] Moreover, her testimony carried the imprimatur of the court given that her work was relied upon by the Jackson County judges and given that her report, which was admitted over objection, was addressed not to the prosecutor, but to Judge McBain, and began with the statement "I have been asked *by the Court* to provide a report regarding Michael Patrick Hamilton" (emphasis added).

[9] In *People v Jones*, 119 Mich App 164, 168-169; 326 NW2d 411 (1982), this Court stated:

> Evidence of whether a defendant is an heroin addict at or near the time of a charged theft offense may be relevant and admissible as proof of motive. See MRE 404(b); MCL 768.27; MSA 28.1050; *People v Talaga*, 37 Mich App 100, 103; 194 NW2d 462 (1971). Evidence of heroin use, however, has a strong prejudicial effect. Thus, the legal relevance of heroin addiction to motive for a theft offense is dependent on two factors: *(1) that defendant was addicted at or near the time of the offense and, therefore, compelled to obtain the drug,* and (2) that defendant lacks sufficient income from legal sources to sustain his or her continuing need for heroin. See *People v Walker*, 86 Mich App 155, 159 fn 2; 272 NW2d 222 (1978). Without such a foundation, evidence of heroin use should be excluded from proof of motive, as its prejudicial effect substantially outweighs its probative value. See MRE 403; *Walker, supra,* 160. [emphasis added.]

[10] This is not to say that someone with her qualifications could not offer an opinion that a person would likely relapse into addiction at some time in the future based upon their past performance

Heise further testified that Suboxone, a drug often used to treat opiate addiction and which defendant was prescribed in 2009 and 2011, "could be abused." She even testified that people abusing Adderall sometimes snort it and she stated in her report "I wonder if Mr. Hamilton wasn't snorting" despite the absence of any evidence that he had. To the degree these statement were actual opinions about defendant's drug use they violated MRE 703. To the degree they were not opinions, but merely "wonderings," "concerns" and "could be's," they had no place in her testimony at all.

Heise also offered speculation questioning the reliance by Dr. Jajo and the two psychologists on the MAP (Michigan Automated Prescription) history of what prescriptions were filled by defendant on what date and where. She offered her opinion that MAP reports are "not always" fully accurate. However, she offered no examples of erroneous MAP reports nor any studies to support this opinion. When defense counsel objected to the lack of foundation, the trial court erred by stating that the lack of foundation went to weight and not admissibility.

Remarkably, Heise also testified that defendant was not honest with Dr. Jajo because, as she asserted, he didn't tell Dr. Jajo that he was taking Suboxone. However, her belief in this regard was directly contrary to Dr. Jajo's testimony that defendant had told him about his prescription for Suboxone. How she reached this conclusion at all is difficult to determine given that she stated that she had not reviewed Dr. Jajo's records.

She then used this erroneous opinion to conclude that defendant's behavior was that of an addict because that "a component of addiction is denial and dishonesty," thereby asserting that defendant had a character for dishonesty—a characterization that plainly violated MRE 404(a). Moreover, it violated MRE 405 because it characterized defendant as dishonest simply on the basis of his alleged addiction instead of upon defendant's own reputation or the opinion of someone who actually knew him.

Heise concluded her testimony by telling the jury that "what matters most to a practicing addict" is "getting the drug . . . at all costs" and, adopting the words of the prosecutor, that "people steal to get money for their drugs" and "people sometimes commit violent crimes to get their drugs." This testimony served as propensity evidence against the defendant; it amounted to testimony that because defendant was an "addict" (as "diagnosed" by the witness) he had a propensity to steal and murder. Normally, improper propensity evidence is at least based upon prior wrongful acts of the defendant himself; here it was based upon his theorized membership in a class of people.

The prejudicial effect of Heise's improper testimony was substantial.[11] Her speculative and improper expert testimony provided the missing "rational explanation" for the shooting, i.e.

_____

and treatment. This is the type of testimony that may be offered about a parent in a child neglect case. However, that is very different from testifying that a person did relapse at a particular time and on a particular drug, particularly when offered without an evidentiary basis.

[11] The trial court did permit the defense to present sur-rebuttal expert testimony. However, the fact that defendant had the opportunity to rebut wholly improper evidence does not render that evidence proper nor assure that the jury would not conclude that it was credible despite its legal

-12-

defendant was a junkie, he needed a fix, and so he killed Marcyan to get his jewelry. This "rational explanation" was wholly without foundation on all counts: there was no evidence defendant was using Vicodin at the time of the shooting, there was no evidence that he needed a fix (he did not undergo withdrawal at the jail), and it was undisputed that he did not steal Marcyan's jewelry.

### III. CONCLUSION

The admission of expert testimony from Heise was erroneous on multiple grounds. Despite repeated requests from defense counsel, the court failed to undertake the "careful vetting" of expert testimony required by the court rules. This error cannot be regarded as harmless. A review of the entire trial transcript reveals that her testimony went to the central issue in the case and that without it the prosecution's rebuttal case was substantially weakened. We should reverse and remand for a new trial.

/s/ Douglas B. Shapiro

---

and foundational inadequacies. In *Gilbert*, the Court did not attempt to compare the effect of the improper expert testimony with the opposing party's experts. See generally *Gilbert*, 470 Mich at 779-791. It is axiomatic that credibility determinations are for the jury and we cannot determine what witnesses the jury found credible. That is the reason that the court must act as a gatekeeper, not merely as a referee trying to provide some balance after the fact.